## UNITED STATES v. MANN.
## SAME v. SIEGEL.
### Nos. 6951, 6956.

Circuit Court of Appeals, Seventh Circuit.
Oct. 30, 1939.

Rehearing Denied Dec. 5, 1939, Jan. 9, 1940.

Owen A. West, of Chicago, Ill., for appellant Mann.

Jacob S. Rothstein, of Milwaukee, Wis., for appellant Siegel.

Val Nolan, U. S. Atty., B. Howard Caughran, Asst. U. S. Atty., and Paul A. Pfister, all of Indianapolis, Ind.

Before EVANS, SPARKS, and KERNER, Circuit Judges.

EVANS, Circuit Judge.

The appellants, Mann and Siegel, were indicted and tried together on charges set forth in an indictment which contained three counts, only two (one and three) of which are here involved. The third count charged a conspiracy to violate the revenue law and the first, the unlawful possession of a still set up in violation of the revenue act. Upon conviction each defendant was sentenced to the penitentiary. Each has appealed. Their appeals were heard at one time and will be disposed of in one opinion.

Upon failure of counsel for Mann to file a brief and upon Mann's request, as an alleged pauper, this court appointed Attorney Owen West to represent him. We are indebted to him for a clear and able presentation of defendant Mann's case.

The first count of the indictment charged unlawful and knowing possession, custody, and control of a still set up and suitable for the manufacture of intoxicating liquor, said still not being registered as required by law. Sec. 1162, 26 U.S.C.A. The third count charged conspiracy to defraud the United States of revenue, etc. Both defendants were acquitted on the second count and convicted on the first and third counts. The court set aside the conviction of Siegel on the first count, but on the third count sentenced him to imprisonment for two years and to pay a fine of $1,000. The verdict of guilty on both counts against defendant Mann was allowed to stand, and he was sentenced to three years' imprisonment and to pay a fine of $1,000.

On these appeals, defendant Siegel challenges the sufficiency of the evidence to support his conviction on count three. He also charges a prejudicial interruption of the cross-examination of a witness by the court. In addition to the errors assigned

by Siegel, counsel for Mann challenges the sufficiency of the evidence to sustain conviction on either count.

Mann was sentenced to the penitentiary for three years. The maximum imprisonment penalty which could be imposed on each of counts one and three is two years. Inasmuch as the sentence was for three years, counsel argue, and logically, that failure of evidence to support conviction on either count must result in a reversal of the judgment against Mann.

Is the evidence sufficient to sustain the verdict of guilt against both Siegel and Mann on count three and to sustain Mann's conviction on count one? Our study of the evidence leads us to make an affirmative answer.

In reaching this conclusion and in making the following fact statement, we have accepted the Government's version of contradicted statements, for we are under obligation to accept the jury's judgment where veracity is in issue. Accepting this well-settled rule of law, we can only look to the record to see if any substantial testimony, not inherently unbelievable, appears, which supports the verdict.

Appellant Mann argues that inasmuch as the court set aside the verdict against Siegel on count one on evidence almost similar to that on which he was convicted, he, too, should have been freed of the charge found in this first count. The answer to this contention is—The conviction of Siegel on count one may also have been supported by competent evidence, and furthermore Mann may not complain because his confederate received a more favorable sentence than he. Mann's guilt and sentence are not to be determined by the court's or jury's estimate, false or sound, of a confederate's character or by the extent of a coconspirator's guilty participation in the substantive offense.

Nine defendants were indicted. One was not apprehended, although his guilt was clear. He was too fleet of foot when the raid on the still was made, and he has been successful in concealing himself since. Of the remaining eight defendants, five pleaded guilty. Siegel and Mann have consistently asserted their innocence.

Mann testified in his own defense. Siegel did not. Mann's testimony was flatly contradicted on material facts by ten witnesses. These ten witnesses were disinterested. Uncontradicted and undisputable facts also placed Mann in an embarrassing position, which necessitated explications. His attempted explanations were rather sorry and the jury may have reached the conviction that he was either a stranger to, or hardly on speaking terms with, a character called truth.

Inferences from facts may be quite as persuasive as direct or positive testimony. A jury might well have asked of Mann—Why tell so many falsehoods? Why carry title to a truck in another's name? Why carry a false telephone number on the truck? Why, a false business address? Why adopt a fictitious name with a false residence on the body of your truck?

Nor is direct evidence of guilt lacking. Mann left Chicago about midnight and with another party (a defendant, a Mr. Wasielewski, who pleaded guilty but who did not testify on the trial) traveled for one hundred and fifty miles on Sunday night to the location of the still. Reaching the destination about 3:30 A. M., his truck turned off the road, went through a small corn field, then over an untraveled field to "a woods." His truck carried a valuable load of still equipment and supplies. Mann says he went solely to drive the truck back, that he was ignorant of the contents of the load, or of the purpose of the trip and of its destination. The truck load consisted of a 75 horse power boiler, two electric motors, and three water pumps, 300 pounds of cement, 200 pounds of asbestos and boiler bases, etc., and this material was hauled to its destination to repair and increase the capacity of a 1500 gallon a day still which had been operated until its boiler had blown up a few days previously.

One of the defendants said he was waiting the arrival of a truck with the new boiler and was to give warnings to the truck driver, if necessary. While thus waiting and watching, he was seized by revenue agents shortly before the truck and the defendant appeared. Another witness testified that codefendant W, who was driving the truck when the arrest was made, said he had been sent "to show Mann where to take the stuff *down to the still site.*" This and other statements made at this time by W in Mann's presence, in response to pertinent inquiries as to how and why they were bringing a truck loaded (but concealed by tarpaulin) with still supplies to an out of the way place—off the road—behind a corn field—in the woods—at 3 A.

M. Sunday night—were not satisfactorily explained.

As to Siegel's participation in the conspiracy, little need be said. It may be conceded that the direct testimony connecting him with the offense is not so clear or persuasive as the testimony against Mann. There was, however, testimony showing both Siegel's and Mann's participation in the business of hauling sugar by trucks owned and operated by them. A jury could have found that they were both interested in the truck that carried the load of still equipment on the night in question. Siegel made the down payment of $100 when this truck was purchased. He paid for the repair to the body of the old truck which was placed on the chassis of the new truck. He paid garage bills, gas and oil charges for this and other trucks in the garage.

Of significance was a circumstance which occurred when Mann was in jail shortly after his arrest. He was endeavoring to get released on bail. He communicated with his wife, he says, but not directly. He sent a telegram to his mother-in-law, copy of which was in the Government's possession. Therein he said, "Unable to understand delay. Ask Phil to lend money. Will pay upon release." Defendant Siegel's first name was Phil. Not long after said wire was sent, Phil Siegel's nephew, a Chicago lawyer, put up $10,000 as bail to obtain Mann's release. Mann explained that he meant another Phil when his attention was called to the name "Phil." However, he had already disputed ten other witnesses on material facts and the jury was justified in assuming that Attorney Siegel of Chicago, nephew of defendant, Philip Siegel, was not acting as a volunteer in putting up $10,000 of securities to obtain Mann's release.

The fact which is the hardest to explain to a stranger to the trial who reads the records without the trial court's advantage of seeing and hearing the witnesses, is the presence of Mann in an out of the way place on Sunday morning at 3:30 A. M., in a truck carrying a large load of valuable still equipment, off the road, a few rods from the location of a 1500 gallon a day still.

The difficult position which defendant was in may account for his strained efforts to prove his innocence and his willingness to dispute the testimony of any one.

One fellow, a Mr. Slesur, testified that he, not Mann, was the party guilty on count one. He said he purchased the supplies and he owned the still for which the new boiler was purchased. His testimony was not persuasive. It was wholly uncorroborated. Although the material sent down was expensive, he was unable to tell from whom the boiler was purchased.

Mr. Slesur said:

"I bought those things on Ogden Avenue and the pumps I bought on Lake Street at some dealers. * * * The still cost me $3300. I borrowed the money from some friends. I bought the boiler on credit. I don't know the name from whom I bought the boiler. * * * I got my sugar from some friends, some Italian fellows in Chicago. I got it in Chicago at the freight yard where I picked it up."

A kinship apparently exists between certain crimes as it does in the conduct of criminals participating in certain crimes. Detection of such perpetrators may follow familiar lines. Conduct of a party when apprehended in the act or arrested in the vicinity of the crime is often indicative of a guilty or innocent state of mind. False statements at such time (as here made by Mann) might well be expected of a guilty party while truthful statements, even though embarrassing, will come from the lips of the innocent. Mann said, when arrested and within a few rods of the still, he knew nothing of the nature of the equipment he was hauling, thus disputing his own subsequent statement as well as that of the defendant S. He also professed innocence of the existence or location of the illicit still. He thereby disputed W who was present at that time and said, "I was along on the truck to show Mann the location of the still site."

Night and darkness often are chosen for the commission of crime. Selection of Sunday from about midnight to 3 A. M. is in harmony with the conveyance of still equipment to the place of crime. Difficulty in locating or getting to a still (here present) is suggestive of the operation of an illicit still. The ease with which one finds his way to or from a hidden, off-the-road spot on a big truck is one of many straws which helps point the way to truth.

Possession of stolen goods gives rise to a presumption of guilt in theft cases under certain conditions. Presence near a large still in a hidden spot with a truck loaded with still accessories of large value at 3 A. M. in the morning also creates pre-

sumptions and calls for explanations. Explanations are generally matters for juries to analyze and weigh. Credibility of witnesses bears on acceptability of explanations. Here, the jury rejected defendant's professions of innocence in the face of stubborn facts plainly pointing to his guilt. It was another case so common in criminal trials—professions of innocence by the accused opposed by indisputable facts pointing to guilt.

It is self-evident that someone supplied the money and the enterprise necessary to purchase equipment and set up and operate the still with a 1,500 gallon a day capacity. Moreover, it was no dumb clod such as fired the engine, mixed the mash, and acted as look-out for revenue agents, who conceived and executed this illegal enterprise. The jury must have realized that the execution of this enterprise necessitated the possession and delivery of large quantities of sugar, yeast, and other ingredients that make up "mash." It necessitated the sale of liquor in violation of law—slyly, secretly, and clandestinely. All these facts the jury must have weighed, although no direct testimony established them.

Counsel for defense correctly rely upon the presumption of innocence that attends their clients throughout the trial. They properly rely heavily upon the burden of proof which rests upon the Government to establish guilt beyond a reasonable doubt by evidence which is clear and which is not as consistent with the theory of innocence. They ignore, however, the fact that evidence, and most persuasive evidence, may be other than the spoken word. Physical facts do not bend nor yield to personal interest or to selfish or interested motives. Credibility is not involved when an illicit still, secreted in an out-of-the-way place, speaks. One who asks jurors to accept his assertion of innocence in the face of the fact that he was at the site of a large illegal still at 3:30 A. M. in the morning in a truck owned by him, with hundreds of dollars of equipment therein, sent to repair a large illegal still, which had broken down, and which truck and repairs were awaited expectantly *that night,* by those whose task was to keep the fires burning and a sharp look-out for revenue agents, may not be disappointed if the jury accepts the physical facts and their strong inferences instead of the words—the professions of innocence of the accused. And moreover, once they are convinced on a material fact issue that the accused spoke falsehoods, the said jury might well have rejected other testimony by the same party given, unless supported by corroborative evidence.

Nor can this—an appellate court—overestimate the advantages which the jury enjoyed in seeing and hearing the defendant Slesur. So far as direct testimony is concerned, Slesur absolved Mann from liability on count one. But in cases where there is much conflicting evidence the spoken word may not be conclusive. A witness speaks to the jury not alone through his lips. His story may be so ridiculously unbelievable, so contrary to physical facts, so imaginative as to out-fable fairy lore. If Slesur owned and operated the still, then surely the jury must have found that he falsified when he said he bought the boiler (shortly before) on credit but from one he knew not; that he bought sugar from some Italians of South Chicago whom he did not know—down "in the yards of South Chicago"—that he purchased pumps from someone unknown, but on credit—without a word of this improbable story corroborated when all could have been supported by other testimony. Well might the jury have doubted and rejected the balance of this man's story unless corroborated. In fact, it was not merely uncorroborated, the motive for its falsity was not absent.

The trial judge in our opinion properly left both defendants' guilt to the jury. Two cases which we have read with interest are Barton v. United States, 4 Cir., 267 F. 174; and Girgenti v. United States, 3 Cir., 81 F.2d 741. The former supports the Government's position. The defendant may well urge the reading of the latter case. The facts in a broad sense are not dissimilar to our case. Yet there are differences, and it is the differences in each case which determine which case should be taken from the jury.

Other assignments of error, we have examined. They are not properly preserved. Neither do they impress us as substantial or prejudicial even if we agreed that the rulings were erroneous, which we do not.

The judgments are affirmed.